PETTIGREW, J.
| gPlaintiffs-appellants, Karen and Larry Williams, appeal the trial court’s judgment, granting a motion for summary judgment filed by defendants-appellees, Joseph and Cindy Galofaro and their insurer, Farm Bureau Casualty Insurance Company (“Farm Bureau”), and dismissing their claims with prejudice. For the reasons that follow, we affirm.
FACTS AND PROCEDURAL HISTORY
This action arises from an accident that occurred in the home of the Galofaros on December 28, 2007. According to the record, Ms. Williams, the Galofaros’ housekeeper, was cleaning the garden bathtub in the master bathroom when Buddy, the family’s Shitzu puppy, got under foot, causing her to trip and sustain injuries to her arm and shoulder. Ms. Williams and her husband filed suit against the Galofa-ros and their insurer, Farm Bureau, pursuant to La. Civ.Code arts. 2315 and 2321, alleging fault on the part of the Galofaros in the following respects:
a. Failure to provide [Ms. Williams] a safe place to perform the job she was hired to do;
b. Failure to make arrangements to restrain or otherwise prevent their dog from hindering [Ms. Williams] as she went about her work; and
c. Such other acts of negligence that will be learned of during discovery and presented at trial.
In response to the petition for damages, the Galofaros and Farm Bureau (hereinafter “defendants”) filed a motion for summary judgment, asserting that there was no liability on their part based on the undisputed material facts and that they were entitled to summary judgment as a matter of law. In support thereof, defendants submitted the July 28, 2009 deposition of Ms. Williams. Plaintiffs submitted an opposition to the motion for summary judgment, offering a September 27, 2010 affidavit by Ms. Williams to counter defendants’ position.
On October 4, 2010, the trial court heard arguments on the motion for summary judgment. After considering the applicable law and the evidence in the record, the trial court granted defendants’ motion for summary judgment, finding no genuine issue of material fact as to the unreasonable risk of harm posed by the Galofaros’ puppy being | ¿¡underfoot. A judgment in accordance with these findings was signed by the trial court on October 18, 2010, granting defendants’ motion for summary judgment and dismissing plaintiffs’ claims with *1070 prejudice. It is from this judgment that plaintiffs have appealed, assigning the following as error: “The trial court committed error in finding there were no material facts in dispute despite the plaintiffs sworn affidavit establishing same.”
SUMMARY JUDGMENT
Summary judgments are reviewed on appeal de novo. Boudreaux v. Vankerkhove, 2007-2555, p. 5 (La.App. 1 Cir. 8/11/08), 993 So.2d 725, 729-730. An appellate court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law. Ernest v. Petroleum Service Corp., 2002-2482, p. 3 (La.App. 1 Cir. 11/19/03), 868 So.2d 96, 97, writ denied, 2003-3439 (La.2/20/04), 866 So.2d 830. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966(B).
When a motion for summary judgment is made and supported as provided by law, an adverse party may not rest on the mere allegations or denials of his pleading. His response, by affidavits or as otherwise provided by law, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, will be rendered against him. La.Code Civ. P. art. 967; Robles v. ExxonMobile, 2002-0854, p. 4 (La.App. 1 Cir. 3/28/03), 844 So.2d 339, 341.
On a motion for summary judgment, the burden of proof is on the mover. If, however, the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover’s burden on the motion does not require that all essential elements of the adverse party’s claim, action, |4or defense be negated. Instead, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, the adverse party must produce factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the adverse party fails to meet this burden, there is no genuine issue of material fact, and the mover is entitled to summary judgment. La.Code Civ. P. art. 966(C)(2); Janney v. Pearce, 2009-2103, p. 5 (La.App. 1 Cir. 5/7/10), 40 So.3d 285, 288-289, writ denied, 2010-1356 (La.9/24/10), 45 So.3d 1078.
Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Bridgefield Cas. Ins. Co. v. J.E.S., Inc., 2009-0725, p. 4 (La.App. 1 Cir. 10/23/09), 29 So.3d 570, 573.
The law governing claims for damages caused by animals is La. Civ.Code art. 2321, which after its amendment by 1996 La. Acts, 1st Ex.Sess., No. 1, § 1, provides:
The owner of an animal is answerable for the damage caused by the animal. However, he is answerable for the damage only upon a showing that he knew or, in the exercise of reasonable care, should have known that his animal’s behavior would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nonetheless, the owner of a dog is strictly liable for damages for injuries to persons or property caused by the dog and which the owner could have pre *1071 vented and which did not result from, the injured person’s provocation of the dog. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate ease. [Emphasis added.]
In the case of Pepper v. Triplet, 2003-0619 (La.1/21/04), 864 So.2d 181, the Louisiana Supreme Court reviewed the history of Article 2321 and significant jurisprudence interpreting its provisions. It noted that in Holland v. Buckley, 305 So.2d 113, 119 (La.1974), the court interpreted the version of Article 2321 then in effect and concluded that the owner of the animal was presumed to be at fault and [scould only exculpate himself by proving that the harm resulted from some independent cause not imputable to him.[1] Applying that principle, the Holland court imposed liability on the owner of a dog that had bitten the plaintiff, despite the lack of any evidence of the owner’s fault, because the owner did not rebut the presumption of fault created by the injury caused by the dog. Pepper, 2003-0619 at 8-9, 864 So.2d at 188.
In a later case, Boyer v. Seal, 553 So.2d 827, 834 (La.1989), the court backed away from the almost absolute liability of Holland by applying the unreasonable risk of harm principle to animals, which posits that the damage must have been caused by a vice or aspect of the thing that creates an unreasonable risk of harm to others, citing the strict liability provisions of La. Civ.Code art. 2317, as interpreted by Loescher v. Parr, 324 So.2d 441, 446-449 (La.1976). The Boyer court stated, “Subsequent to Loescher, this court has not allowed recovery for damage by a domestic animal in the absence of proof that the injury resulted from an unreasonable risk of harm created by the animal.” Boyer, 553 So.2d at 833. The Boyer court noted that “the judicial process involved in deciding whether a thing under garde posed an unreasonable risk of harm is similar to that of taking into account all of the social, moral, economic and other considerations as would a legislator regulating the matter.” Boyer, 553 So.2d at 834-835.
The owner of an animal is answerable for the damage he has caused; but if the animal had been lost, or had strayed more than a day, he may discharge himself from this responsibility by abandoning him to the person who has sustained the injury; except where the master has turned loose a dangerous or noxious animal, for then he must pay for all the harm done, without being allowed to make the abandonment.
In Boyer, the plaintiff was visiting in her daughter’s home when her daughter’s cat rubbed up against, ran, or walked between the plaintiffs legs, causing her to lose her balance and fall. The court held that, as a policy matter, the behavior of the cat in rubbing the legs of a visitor in its home or accidentally getting in the way or underfoot did not present an unreasonable risk of harm. The court reasoned that the cat’s behavior was innocuous, especially when compared with other cat-related risks widely | (;tolerated by our society. Further, the court found that the likelihood of injury resulting from this type of behavior multiplied by the gravity of the harm threatened by it did not outweigh the social utility of keeping a cat as a pet in the home where it may be exposed to visiting relatives and guests. The court also held that the daughter was not guilty of negligent behavior which caused her mother’s injuries. Boyer, 553 So.2d at 835. Reviewing this decision in the Pepper case, the court stated:
Essentially, then, Boyer applied the unreasonable risk of harm principle to animals in order to limit strict liability against their owners because of the competing social policy that the owner of an *1072 animal should not be required to insure against all risks and because the court had been applying the same or similar principle to things and buildings.
Pepper, 2003-0619 at 11, 864 So.2d at 190.
The Pepper court then analyzed the 1996 amendment to Article 2321 and concluded that, although the legislature added the phrase, “which the owner could have prevented,” and did not include the term “unreasonable risk of harm,” the court did not read that language “as an expansion of liability toward a superstrict or absolute standard” to be applied when a dog causes injury. Pepper, 2003-0619 at 18-19, 864 So.2d at 194. The court concluded that the amendment effected no practical change in how the courts should apply Article 2321 to dog claims, stating:
[T]he legislature’s 1996 amendment of Article 2321 simply changes the law to make Holland and the strict liability doctrine no longer applicable to animals other than dogs. Furthermore, as we explained in Boyer, the unreasonable risk of harm principle represented, in effect, a limitation, albeit perhaps a partially jurisprudential one, upon the reach of strict liability, so the owner of an animal is not required to insure against all risk or loss. We detect no legislative retreat from that principle in the 1996 amendment to Article 2321.
Pepper, 2003-0619 at 20, 864 So.2d at 195. The court further summarized its conclusions concerning the elements of a claim under Article 2321 as follows:
[T]o establish a claim in strict liability against a dog owner under [La. Civ. Code art. 2321] as amended in 1996, the plaintiff must prove that his person or property was damaged by the owner’s dog, that the injuries could have been prevented by the owner, and that the .injuries did not result from the injured person’s provocation of the dog. We hold that, to establish that the owner could have prevented the injuries under Article 2321, the plaintiff must show the dog presented an unreasonable risk of harm.
17Pepper, 2003-0619 at 1-2, 864 So.2d at 184. The criterion for determining whether a defendant has created or maintained an unreasonable risk of harm is a balancing of claims and interests, a weighing of the risk and gravity of harm, and a consideration of individual and societal rights and obligations. Pepper, 2003-0619 at 21, 864 So.2d at 195-196; see also Thibodeaux v. Krouse, 2007-2557, p. 4 (La.App. 1 Cir. 6/6/08), 991 So.2d 1126, 1129.
In the Pepper case, which involved a man entering his neighbor’s fenced backyard where the neighbor’s dog was allowed to roam free, the court found that “until the plaintiff intentionally and knowingly entered the defendant’s backyard without authority, the defendant’s dog did not present an unreasonable risk of harm to the plaintiff or the public.” Pepper, 2003-0619 at 24, 864 So.2d at 197 (emphasis added). The court found that the plaintiffs act of entering the neighbor’s yard without the neighbor’s permission and while the neighbor was away from home amounted to an act of civil trespass, defined as “the unlawful physical invasion of the property or possession of another.” Moreover, the plaintiff could be considered a “trespasser,” defined as “one who goes upon the property of another without the other’s consent.” Pepper, 2003-0619 at 23, 864 So.2d at 197. The court therefore found that the neighbor was not strictly liable for the injuries sustained by the plaintiff when he was bitten by the neighbor’s dog while in the neighbor’s fenced backyard retrieving his son’s ball. Pepper, 2003-0619 at 25, 864 So.2d at 198.
On appeal, plaintiffs argue that the Galofaros were specifically warned and knew that Buddy was a danger to Ms. *1073 Williams. Plaintiffs maintain that the Ga-lofaros knew Buddy was “causing trouble for [Ms. Williams] and because of its boisterous nature could cause her harm.” Thus, plaintiffs argue the Galofaros are strictly liable for the injuries caused to Ms. Williams “since they knew the dog was unreasonably dangerous under these facts and [Ms. Williams’] injuries could have been prevented.” In the alternative, plaintiffs contend the Galofaros were negligent for not allowing Ms. Williams |8to lock Buddy up while she was working. Ms. Williams asserts that “she was not allowed to lock the dog up under penalty of losing her jobs.”[2]
In response to these arguments, defendants maintain there is no basis from the evidence to conclude that the dog presented an unreasonable risk of harm to Ms. Williams who knew of the dog’s propensities and was in the best position to exercise control over her working conditions. Moreover, defendants argue that “[a]l-though [Ms. Williams] seems to make much about the contention that the Galofa-ros would be upset if their dog was locked up, it is certainly obvious to anyone looking at the facts objectively, that if the dog was a nuisance, [Ms. Williams] merely needed to close the door in the room she was working to eliminate that problem.”
In the instant case, defendants submitted the deposition of Ms. Williams in support of their motion for summary judgment. Ms. Williams testified in her deposition that she had been employed by the Galofaros for approximately two years. About one year prior to the date of the accident in question, the Galofaros brought home a Shitzu puppy named Buddy. According to Ms. Williams, the Galofaros had instructed her that if Buddy was bothering her while she was cleaning, she was to either put him in the guest bathroom or spank him. Ms. Williams testified that there was a “make-shift fence” in the guest bathroom where she could put Buddy. When asked if she had ever put Buddy in the guest bathroom while she was cleaning, Ms. Williams indicated that she had only done it on one occasion because she felt like the Galofaros “didn’t like it” when she did.
She described the one incident when she had put Buddy in the guest bathroom, recalling how the Galofaros’ son came home that day and asked where Buddy was. Ms. Williams testified that after she told him she put Buddy in the guest bathroom, she “could just tell that it wasn’t maybe a good choice for [her] to put the dog in the bathroom that day.” Shortly after the Galofaros’ son left the house, Ms. Galofaro phoned and asked if |flBuddy was “being bad.” Ms. Williams responded that he was, telling Ms. Galofaro that she was trying to do her work and that Buddy had been “tearing up the plant” and “going in and out [of] the mop bucket.” Ms. Williams explained to Ms. Galofaro that she did not whip Buddy, indicating that she would never hit a dog, but that she was there to clean so she put Buddy in the guest bathroom. Ms. Williams further testified as follows: ‘Well, actually she called to let him back out because I figured, you know, here we go. This is a problem now.”
When asked if there were any other discussions with the Galofaros about Buddy causing a hindrance to her work, Ms. Williams stated:
Well, one day I was in the ... master bath, the vacuum cleaner had broke. I was on the floor trying to take the belt off and ... here was Buddy_ And *1074 then that evening. I was telling [Ms. Galofaro] but not in a mean way just trying to explain ... I didn’t need him there, but it wasn’t a big deal. You know, it wasn’t a big deal. That was their baby and ... then I just quit telling them anything because I needed my jobs.
Ms. Williams indicated that even prior to the accident in question, Buddy was a nuisance and hindrance to her work. She testified that he would get underneath the blankets when she was trying to change the beds and that one morning, she almost stepped on him when he got underneath a comforter on the floor.
Concerning the day of the accident, Ms. Williams testified in her deposition that she was cleaning the garden bathtub in the master bathroom and that she was bent over, wiping the back of the bathtub. With regard to how she was injured, she stated, “as I was wiping, I went to step, and when I step, I heard him scream. I went down. My arm slid around the ... whole back edge of the tub all the way up to the faucet and went all the way back.” According to Ms. Williams, she had been cleaning for approximately three hours before the accident and during that time, Buddy had not been a problem. She remembered seeing Buddy playing with his toys in the dining room and the living room during the morning. Ms. Williams testified that Buddy was not in the habit of following her around from room to room as she was cleaning and that Buddy was not in the master bathroom when she went in to do her work.
Imln response to the motion for summary judgment, plaintiffs submitted the affidavit of Ms. Williams wherein she emphatically declared that she would not have fallen if the Galofaros would have allowed her to lock Buddy in the guest bathroom while she worked. She also stated that prior to the date of the accident, Buddy had interfered with her work, was a hin-di'ance to her, and was a danger to her. Ms. Williams also recounted the incident involving the one time she had put Buddy in the guest bathroom:
Prior to the date of the accident, I put the dog in the guest bathroom to keep him from getting under foot and interfering with my work. On that same day ... the [Galofaros’] son, came home. When [he] found out I had put the dog in the bathroom, he became upset. Once [he] left, [Ms. Galofaro] called and questioned me about why the dog was in the bathroom.... I received the message that I was to let the dog out of the bathroom if I wished to keep my employment. I, therefore, did not lock the dog up while I was at work.... As a result of my conversation with her, [Ms. Galofaro] knew the dog was a danger to me, as it was following me around and getting under foot.
As previously discussed, plaintiffs bear the burden of proving by a preponderance of the evidence that Buddy caused Ms. Williams’ injuries, that the injuries could have been prevented by the Galofaros, and that the injuries did not result from Ms. Williams’ provocation of the dog. To show whether the Galofaros could have prevented the injury, plaintiffs must establish that Buddy posed an unreasonable risk of harm. See Pepper, supra. We conclude that based on the facts and circumstances herein, the trial court did not err in determining that plaintiffs could not make a showing that Buddy presented an unreasonable risk of harm to Ms. Williams.
Ms. Williams conceded that she had been instructed by the Galofaros to either spank Buddy or put him in the guest bathroom if he was ever bothering her while she was working. Even though Ms. Williams asserts that it was her perception that the Galofaros would be unhappy if she locked Buddy up and that she could possi *1075 bly lose her job for doing so, Ms. Williams was well aware of Buddy’s playful propensities prior to the accident and had the option to close the door to the room she was working in to keep Buddy from interfering with her work. Yet she failed to do so. The Louisiana Supreme Court has confirmed that the legislative fact consideration and risk-utility balancing tests are valid approaches to determining whether a person or thing under garde poses an |, unreasonable risk of harm to others. We do not believe that a legislator or other objective policy maker regulating this case, after weighing all social, economic, moral, and other considerations, would decide that the behavior of Buddy in accidentally getting in the way or underfoot is an unreasonable risk of harm. See Boyer, 553 So.2d at 835. Further, it does not appear that the likelihood of injury resulting from such puppy-like behavior multiplied by the gravity of the harm threatened by it would outweigh the utility of keeping a dog as a pet in a home where it may be displayed and exposed to visiting relatives and guests. Id. Accordingly, summary judgment was appropriate.
CONCLUSION
For the above and foregoing reasons, we affirm the judgment of the trial court granting summary judgment in favor of defendants, Joseph and Cindy Galofaro and Farm Bureau Casualty Insurance Company, and dismissing, with prejudice, the claims of plaintiffs, Karen and Larry Williams. All costs associated with this appeal are assessed against Karen and Larry Williams.
AFFIRMED.
WELCH, J., dissents and assigns reasons.

. Before it was amended in 1996, Article 2321 stated:

. Ms. Williams testified that she not only cleaned the Galofaros’ home, but that she also provided housekeeping services for the Galo-faros’ rental homes and the homes of other Galofaro family members.