**FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000427
28-NOV-2023
08:05 AM
Dkt. 64 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---

NO. CAAP-18-0000427

SHELBY RHO FRANKS; JAMES PAUL FRANKS; AND BRANDY LEA FRANKS,
Plaintiffs-Appellants, v.
DESTINI HOLLOWAY,
Defendant/Cross-Claim Plaintiff/Cross-Claim Defendant-Appellee,
and
PAUL JASON SPAULDING,
Defendant/Cross-Claim Defendant/Cross-Claim Plaintiff/
Cross-Claim Plaintiff-Appellee,
and
JAYNE R. NAGANUMA; KRYSTYN CENDROWSKI; KALA SINGSON,
Defendants/Cross-Claim Defendants-Appellees,
and
JOHN DOES 1-10; JANE DOES 1-10; DOE CORPORATIONS 1-10;
DOE PARTNERSHIPS 1-10; ROE "NON-PROFIT" CORPORATIONS 1-10;
AND ROE GOVERNMENTAL ENTITIES 1-10, Defendants,
and
PAUL JASON SPAULDING, Third-Party Plaintiff-Appellee,
v.
VCA ANIMAL HOSPITALS, INC., Third-Party Defendant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 15-1-0188)

NOVEMBER 28, 2023

LEONARD, PRESIDING JUDGE, HIRAOKA AND MCCULLEN, JJ.

OPINION OF THE COURT BY LEONARD, J.

This case arises out of a dog bite injury suffered by an employee at a veterinary clinic, after a dog was turned over to a veterinarian and clinic staff members for medical examination. We hold that Hawaii's primary assumption of risk doctrine bars a veterinarian and/or veterinary staff from recovering damages from a dog owner for a dog bite sustained on the job when the dog is in the care, custody and control of the veterinarian and/or veterinary staff, and not the dog's owner. The inquiry is a legal one, not a factual one, based on the objective risk of handling of a dog, separated from the dog's owner, in a medical setting. Under the circumstances of this case, the Veterinarian's Rule barred the dog owner's normal duty of care, and thus the plaintiffs cannot support a claim of negligence against the dog owner.

Plaintiffs-Appellants Shelby Rho Franks (**Shelby**), James Paul Franks, and Brandy Lea Franks (collectively, the **Franks**) appeal from the March 4, 2019 First Amended Final Judgment in Favor of Defendant Paul Jason Spaulding and Against [the **Franks**], and Dismissing All Other Claims Filed Herein (**Amended Final Judgment**) entered by the Circuit Court of the First Circuit (**Circuit Court**).[1] The Franks also challenge the Circuit Court's March 1, 2017 Order Granting Defendant Paul Jason Spaulding's Motion for Summary Judgment (**Order Granting Summary Judgment**).

---

[1] The Honorable Bert I. Ayabe presided.

I.   BACKGROUND

   A.   Background Facts[2]

      Defendant-Appellee Paul Jason Spaulding's (**Spaulding's**) dog Primo (**Primo**), an American Staffordshire Terrier (a type of pit bull), was not able to control when he urinated, and his urine was discolored.  Primo was not behaving like himself and "was sluggish and moping around the house."  Spaulding scheduled an appointment for Primo at VCA Waipahu Animal Hospital (**VCA**) for a possible urinary tract infection.  When making the appointment, Spaulding requested a muzzle for Primo from VCA.  On November 1, 2014, Spaulding took Primo to VCA for his appointment.  Primo was collared and leashed while at VCA.

      On November 1, 2014, Shelby was on her third day of work at VCA as a part-time kennel attendant.  Shelby's duties were "to maintain the kennels and provide medications to the patients, among other light duties."

      Spaulding and Primo were instructed to wait in the waiting room of VCA.  Primo urinated in the waiting room and Shelby was asked to clean up the mess.  Primo barked and whined while Spaulding held Primo back so Shelby could clean.

      Kala Singson (**Singson**), a VCA employee, escorted Spaulding and Primo to an examination room.  While Singson asked Spaulding questions about the visit, Primo smelled and licked Singson's hand.  Singson left the examination room and returned with Veterinarian Destini Holloway (**Dr. Holloway**), an employee of

_____

      [2]    The factual background is based on the exhibits attached to the Franks's opposition to Spaulding's motion for summary judgment.

VCA.  Primo growled and barked at Dr. Holloway.  Dr. Holloway exited the room, removed her coat, and re-entered the examination room.  Primo continued growling and barking at Dr. Holloway.

Dr. Holloway provided Spaulding with a cloth muzzle which Spaulding placed on Primo.  Primo continued to growl with the muzzle on.  Dr. Holloway determined that Primo's aggressive actions were protective behavior and recommended to Spaulding that Primo should be removed from Spaulding's presence.  Either Dr. Holloway or Singson checked the muzzle for snug fit.  Singson took Primo's leash from Spaulding.  Dr. Holloway instructed Spaulding to return to the VCA waiting room, which he did.

Dr. Holloway and Singson led Primo from the examination room to a back treatment area.  Dr. Holloway and Singson attempted to restrain Primo and get him to a lateral position for urine collection.  Shelby was in the room preparing to take a different dog on a walk.

Shelby saw Dr. Holloway and Singson having difficulty restraining Primo.  Shelby asked if she could help.  Shelby was told to hold Primo's back legs while Singson restrained Primo's front legs and head.  While Dr. Holloway prepared a sterile catheter, Primo continued to struggle and escaped from the muzzle.  Shelby was instructed to let go of Primo.  Primo turned and bit Shelby's left arm. "[Primo] was locked and [shook] Shelby's arm for about 15 seconds."  Singson left and got Spaulding from the waiting room.

Spaulding grabbed Primo by the leash and harness and got Primo off of Shelby.  Krystyn Cendrowski (**Cendrowski**) was a

4

lead technician and employee supervisor who was present in the treatment area during the incident. Cendrowski took Shelby to the kennel sink to assess Shelby's wounds and tended to her injuries. A VCA employee called the paramedics and Shelby was transported to Queen's Medical Center - West Oahu. Shelby suffered serious injuries to her left arm which required emergency surgery and additional surgeries. Prior to the incident involving Shelby, Primo had never bitten any other person, dog, or animal. Prior to the incident involving Shelby, Primo had been treated multiple times at different animal hospitals, but it was his first time being treated at VCA.

B.   Procedural History

On February 4, 2015, the Franks filed a complaint for negligence against Dr. Holloway. On March 25, 2015, Dr. Holloway filed an answer to the complaint.

On September 29, 2015, the Franks filed a first amended complaint asserting negligence claims against Dr. Holloway and Spaulding. On October 22, 2015, Dr. Holloway filed a cross-claim for indemnification and contribution against Spaulding. On February 2, 2016, Spaulding filed a cross-claim for indemnification and contribution against Dr. Holloway.

On October 27, 2016, the Franks filed a second, two-count, amended complaint asserting negligence claims against Dr. Holloway, Jayne R. Naganuma (**Naganuma**),[3] Singson, and Cendrowski, and a second negligence count against Spaulding.

---

[3]   Naganuma was the hospital manager for VCA.

On November 1, 2016, Spaulding filed a cross-claim for indemnification and contribution against Holloway, Naganuma, Cendrowski, and Singson. Also on November 1, 2016, Spaulding filed a third-party complaint asserting three counts of indemnification and contribution against VCA Animal Hospitals, Inc. (**VCA Animal Hospitals**).

On November 28, 2016, Spaulding filed a motion for summary judgment on the second amended complaint. Spaulding argued that the Franks's claims against him are barred, as a matter of law, by the doctrine of primary assumption of risk. More specifically, Spaulding argued that veterinarians and their staff members assume the risk of being bitten or otherwise injured by an animal during treatment, and that Shelby was working in her capacity as a veterinarian's assistant at VCA, where Primo was being treated, and she was bitten and injured by the dog when the treating veterinarian and staff were trying to care for the dog.

Spaulding further argued that the Franks failed to state a claim against him for which relief can be granted insofar as Hawaii Revised Statutes (**HRS**) § 663-9 (2016) is inapplicable under the circumstances of this case, citing Hubbell v. Iseke, 6 Haw. App. 485, 727 P.2d 1131 (1986).

In opposition, the Franks argued that, under HRS § 663-9, the owner of a dog that causes damages to any person is liable

for those damages "if he is found to be negligent." The Franks further argued that their action against Spaulding was

> based upon his negligence in: (1) failing to maintain supervision and control over his growling, barking pit bull or to remove it from the situation where it could bite someone; and (2) placing a muzzle on his pit bull in such a manner so as to allow the muzzle to fall off and allow the pit bull to attack and maul [Shelby].

The Franks argued that there were genuine issues of material fact for a jury to decide on its allegations of negligence, and that Spaulding's arguments concerning primary assumption of risk would require a "rewrite" of HRS § 663-9.1 (2016) and should be rejected.

A hearing was held on January 23, 2017, and the matter was taken under advisement. A minute order was issued thereafter, and on March 1, 2017, the Circuit Court entered the Order Granting Summary Judgment. The order stated, in relevant part:

> Viewing the evidence in the light most favorable to the non-moving party, the Court finds that there is no genuine issue as to any material fact and Defendant Spaulding is entitled to judgment as a matter of law. The Court finds that the dog was not under the care, custody or control of Defendant Spaulding at the time of the incident. Plaintiffs' claims against Defendant Spaulding are barred by the primary assumption of risk doctrine, and Plaintiffs have failed to state a prima facie case of negligence against Defendant Spaulding. Thus, Defendant Spaulding's Motion for Summary Judgment is granted.

On April 3, 2017, Spaulding filed a notice of dismissal without prejudice of his claims against VCA Animal Hospitals.

On March 21, 2018, the Circuit Court entered an order dismissing all of the Franks's claims in the second amended complaint against Dr. Holloway as all claims against Dr. Holloway were discharged in bankruptcy.

7

On April 11, 2018, the Franks filed a notice of partial dismissal of all claims against Naganuma, Cendrowski, and Singson.

On May 8, 2018, the Circuit Court entered a judgment in favor of Spaulding and against the Franks but failed to specifically identify the claims on which the Circuit Court intended to enter judgment and failed to expressly dismiss all other claims.  After a temporary remand from the Intermediate Court of Appeals, on March 4, 2019, the Circuit Court entered the Amended Final Judgment which resolved all claims as to all parties.

II.  POINTS OF ERROR

The Franks raise four points of error on appeal, contending that the Circuit Court erred in finding and concluding that:  (1) there were no genuine issues of material fact; (2) Spaulding was not liable because the care, custody, and control of his dog had been transferred to the VCA at the time of the incident; (3) the Franks's claims against Spaulding were barred by the primary assumption of risk doctrine; and (4) the Franks failed to state a *prima facie* case of negligence against Spaulding.

III.  APPLICABLE STANDARDS OF REVIEW

The appellate court reviews "the circuit court's grant or denial of summary judgment *de novo*." Querubin v. Thronas, 107

Hawaiʻi 48, 56, 109 P.3d 689, 697 (2005) (citation omitted).  The

Hawaiʻi Supreme Court has often articulated that:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.  In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

Id.

> Questions of statutory interpretation are questions of law to be reviewed de novo under the right/wrong standard.
>
> Our statutory construction is guided by the following well established principles:
>
> > [When construing a statute,] our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself.  And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
> >
> > When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
> >
> > In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.  Moreover, the courts may resort to extrinsic aids in determining legislative intent.  One avenue is the use of legislative history as an interpretive tool.
> >
> > [The appellate] court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning.
>
> *Lingle v. Hawaiʻi Gov't Employees Ass'n, AFSCME, Local 152*, 107 Hawaiʻi 178, 183, 111 P.3d 587, 592 (2005) (internal quotation marks, brackets, and ellipses omitted and block quote format changed).

Kapuwai v. City & Cnty. of Honolulu, 119 Hawaiʻi 304, 308-09, 196

P.3d 306, 310-11 (App. 2008), vacated in part on other grounds,

121 Hawaiʻi 33, 211 P.3d 750 (2009).

IV.   DISCUSSION

    A.   The Franks's Strict Liability Argument

        The Franks argue that HRS § 663-9, Hawaii's dog bite statute, imposes strict liability on dog owners for injuries caused by their dogs.  HRS § 663-9 reads as follows:

> **§ 663-9 Liability of animal owners.**  (a) The owner or harborer of an animal, if the animal proximately causes either personal or property damage to any person, shall be liable in damages to the person injured regardless of the animal owner's or harborer's lack of scienter of the vicious or dangerous propensities of the animal.
>     (b)  The owner or harborer of an animal which is known by its species or nature to be dangerous, wild, or vicious, if the animal proximately causes either personal or property damage to any person, shall be absolutely liable for such damage.

        "As a general rule, if a party does not raise an argument at the circuit court level, that argument will be deemed to have been waived on appeal[.]"  Hawaii Ventures, LLC v. Otaka, Inc., 114 Hawaiʻi 438, 500, 164 P.3d 696, 758 (2007) (quoting Kemp v. State of Hawaiʻi Child Support Enf't Agency, 111 Hawaiʻi 367, 391, 141 P.3d 1014, 1038 (2006).  Here, in opposition to Spaulding's summary judgment motion, the Franks argued that there was a genuine issue of material fact with respect to Spaulding's negligence; they did not argue strict liability.[4]

        However, even if the Franks had timely argued strict liability should be applied under HRS § 663-9, this argument is without merit.  This Court has previously analyzed both the text and the legislative history of HRS § 663-9 and determined that the statute does not mandate that strict liability applies to dog

---

      [4]    Count 2 of the Second Amended Complaint, which stated the Franks's claims against Spaulding, alleged that Spaulding is liable to them under HRS § 663-9 as well as for violation of common law duties, but did not allege strict liability.

bite cases.  See Hubbell v. Iseke, 6 Haw. App. 485, 491, 727 P.2d 1131, 1135 (1986) (holding "[t]he legislative history of HRS § 663-9 renders Plaintiffs' argument that dog owners are strictly liable for injuries caused by their dogs untenable.").

> HRS § 663-9(a) merely eliminates the necessity to prove "scienter" as an element of an animal owner's negligence.  It is not necessary to prove an animal owner's knowledge of his animal's "vicious or dangerous propensities."  Strict liability is imposed by subsection (b) only on the owner of an animal which is "known by its species or nature to be dangerous, wild or vicious."  HRS § 663-9 does not clearly and unambiguously preclude strict liability on the part of a dog owner for injuries inflicted by his dog.  However, the legislative history of HRS § 663-9 indicates that strict liability is not imposed on dog owners, because dogs are not dangerous, wild or vicious by species or nature.
>
> . . . .
>
> Thus, under the statute, persons suffering injury caused by an animal must still prove negligence on the part of the animal's owner in order to make the owner liable for the injury.  The injured person must prove duty, breach of duty, and damages[.]"

Id. at 489-90, 727 P.2d at 1134-35.

After this court's decision in Hubbell, the Hawaiʻi Legislature had ample opportunity to amend HRS § 663-9 and create strict liability for dog owners.  The Hawaiʻi Supreme Court has stated that "[w]here the legislature fails to act in response to our statutory interpretation, the consequence is that the statutory interpretation of the court must be considered to have the tacit approval of the legislature and the effect of legislation."  State v. Hussein, 122 Hawaiʻi 495, 529, 229 P.3d 313, 347 (2010) (internal quotation marks and citation omitted).  Therefore, we conclude the Circuit Court correctly used negligence as the basis for considering potential liability in this case.

B.    Common Law Defenses

The Franks argue that the legislature intended HRS § 663-9.1 to provide the only defenses for dog owners when an injury is caused by their dogs.[5]  On this basis, the Franks contend that Spaulding is barred from raising common law defenses, including primary assumption of risk.

HRS § 663-9.1 was enacted in 1980, after being introduced as part of S.B. 2501-80, the same bill as HRS § 663-9. See 1980 Haw. Sess. Laws Act 218, § 3 at 366-67.

> SECTION 3 of this bill, as amended by your committee, sets out exceptions to any civil liability, which includes absolute liability.
>
> . . . .
>
> These exceptions are not intended to be exclusive as far as common law liability is concerned.  In fact, they are probably included in the common law already.  These exceptions are the ones your Committee feels are most important.  The exceptions are exclusive as far as absolute

---

[5]    HRS § 663-9.1 states in pertinent part:

> **§ 663-9.1  Exception of animal owners to civil liability**.
>
>  . . . .
>
> (b)  Notwithstanding sections 663-1 and 663-9, any owner or harborer of an animal shall not be liable for any civil damages resulting from actions of the animal occurring in or upon the premises of the owner or harborer where the person suffering either personal or property damage as a proximate result of the actions of the animal is found by the trier of fact intentionally or knowingly to have entered or remained in or upon such premises unlawfully.
> (c)  Notwithstanding sections 663-1 and 663-9, any owner harborer of an animal shall not be liable for any civil damages resulting from actions of the animal where the trier of fact finds that:
> (1)    The animal caused such damages as a proximate result of being teased, tormented, or otherwise abused without the negligence, direction, or involvement of the owner or harborer; or
> (2)    The use of the animal to cause damage to person or property was justified under chapter 703.

> liability is concerned since the liability is <u>absolute</u>
> unless an exception is provided.

Conf. Comm. Rep. No. 42-80, in 1980 House Journal, at 1095, Conf. Comm. Rep. No. 36-80, in 1980 Senate Journal, at 958-59 (emphasis in original).

The legislative history is clear. The legislature only intended that the HRS § 663-9.1 exceptions be exclusive for cases involving the strict liability of certain animal owners. <u>See</u> HRS § 663-9(b) (establishing absolute liability for damages proximately caused by "an animal which is known by its species or nature to be dangerous, wild, or vicious"). HRS § 663-9.1 was not intended to be an exclusive list for cases involving a dog owner's negligence. Accordingly, common law defenses are available, and the Circuit Court did not err in allowing Spaulding to raise defenses not enumerated in HRS § 663-9.1.

C.   <u>Claims Barred by Primary Assumption of Risk</u>

1.   <u>The Veterinarian's Rule</u>

The Franks argue that the primary assumption of risk doctrine should not be applied in this case because Shelby was an inexperienced and untrained part-time worker who did not subjectively assume the risk of injury. The Franks also argue that Shelby could not have known that the muzzle would slip off. Spaulding argues that primary assumption of risk is an appropriate defense and what has been coined the Veterinarian's Rule should be applied in conjunction with Hawaii's primary assumption of risk doctrine.

The supreme court has explained:

The "primary" sense of implied assumption of risk emerged, along with the global doctrine itself, out of the common law action of a servant against his master. Used in its primary sense, assumption of risk describes the act of a plaintiff, who has entered voluntarily and reasonably into some relation with a defendant, which plaintiff knows to involve the risk. It is an alternative expression of the proposition that a defendant owes no duty to a plaintiff[.]

Yoneda v. Tom, 110 Hawaiʻi 367, 371, 133 P.3d 796, 800 (2006) (quoting Larsen v. Pacesetter Sys., Inc., 74 Haw. 1, 35, 837 P.2d 1273, 1290 (1992) (emphasis omitted).

In Hawaiʻi, the primary assumption of risk doctrine has been applied to sports-related injuries. See Foronda *ex rel.* Estate of Foronda v. Haw. Int'l Boxing Club, 96 Hawaiʻi 51, 66, 25 P.3d 826, 841 (App. 2001) (holding primary implied assumption of risk was a complete defense where defendant's conduct was an inherent risk of the sporting activity). The doctrine has also been used as the basis for the Fireman's Rule, which was adopted based on considerations of public policy. See Thomas v. Pang, 72 Haw. 191, 197, 811 P.2d 821, 825 (1991) (holding that the Fireman's Rule bars a professional firefighter from recovering damages from a private party for injuries sustained during the course of putting out a fire).

"The inquiry into what constitutes an inherent risk is an objective one, and must be, for the vagaries of prior knowledge or perception of risk would undermine the doctrine's underlying policy that the law should not place unreasonable burdens on the free and vigorous participation in sports."

14

<u>Yoneda</u>, 110 Hawaiʻi at 374, 133 P.3d at 803 (quoting <u>Foronda</u>, 96 Hawaiʻi at 67, 25 P.3d at 842) (internal quotation marks and brackets omitted).

In adopting the Fireman's Rule, the supreme court held that "[d]anger is inherent in a fire fighter's work and the fire fighter is trained and paid to encounter hazardous situations[.]" <u>Thomas</u>, 72 Haw. at 197, 811 P.2d at 825. Furthermore, "the potential for structural collapse is an inherent risk of fire fighting, and one which fire fighters are trained to anticipate. It is common knowledge that burning buildings collapse, and the risk of that occurrence cannot be termed hidden or unanticipated." <u>Id.</u> at 199, 811 P.2d at 826 (quoting <u>Kreski v. Modern Wholesale Elec. Supply Co.</u>, 415 N.W.2d 178, 190 (Mich. 1987) (internal quotations and ellipses omitted).

Other states have adopted the Veterinarian's Rule based on similar rationale. For example, in <u>Nelson v. Hall</u>, 165 Cal. App. 3d 709 (Cal. Ct. App. 1985), a California appellate court held that the principles of primary assumption of risk in the Fireman's Rule applies to veterinarians. The <u>Nelson</u> court concluded that:

> A veterinarian or a veterinary assistant who accepts employment for the medical treatment of a dog, aware of the risk that any dog, regardless of its previous nature, might bite while being treated, has assumed this risk as part of his or her occupation. The veterinarian determines the method of treatment and handling of the dog. He or she is the person in possession and control of the dog and is in the best position to take necessary precautions and protective measures. The dog owner who has no knowledge of its particular vicious propensities has no control over what happens to the dog while being treated in a strange environment and cannot know how the dog will react to treatment. A dog owner who does no more than turn his or her dog over to a qualified veterinarian for medical

> treatment should not be held strictly liable when the dog bites a veterinarian or a veterinary assistant while being treated.

Id. at 715 (emphasis omitted).

The Veterinarian's Rule has been applied to similar situations, including dog groomers and kennel workers. See Jordan v. Lusby, 81 S.W.3d 523 (Ky. Ct. App. 2002) (holding that a dog groomer, like all other professions involving the care of animals, assumed the risk of being bitten by the dog when the groomer accepted the dog for grooming); see also Priebe v. Nelson, 140 P.3d 848 (Cal. 2006) (holding the kennel worker assumed the risk of being bitten when the dog was in the care, custody, and control of the kennel); Lundy v. Stuhr, 363 S.E.2d 343 (Ga. Ct. App. 1987) (holding that assumption of risk barred recovery for a male kennel attendant who ignored signs on cage door that the dog had a propensity to bite females).

The Franks argue that the California case law requires plaintiffs to knowingly assume the danger the dog will bite. However, in Priebe, the California Supreme Court directly addressed the issue:

> Although the Nelson court reported several facts probative of the plaintiff's subjective appreciation of the risk of being bitten while she assisted in the medical treatment of the dog that bit her, we do not read the decision as placing principal reliance on those facts as the basis for the veterinarian's rule announced therein. As we subsequently explained in Knight, a plaintiff's subjective appreciation of the risks involved is no longer relevant to the question whether the defense of primary assumption of risk applies. Knight makes it clear that the inquiry is a legal and not a factual one and entails scrutiny of objective factors having to do with the nature of the activity engaged in by the defendant, and the relationship of the plaintiff and the defendant to that activity.

Priebe, 140 P.3d at 1123 n.2 (citations omitted).

Here, Shelby's employment at VCA required her to work with dogs receiving medical treatment.  The lack of training or subjective awareness that a muzzled dog could bite does not affect the objective test as to the inherent risk that handling dogs away from their owners in a medical setting could be unpredictable and lead to injury.  In this instance, Shelby had objectively assumed the inherent risk of a possible dog bite as part of her employment at a veterinary clinic.

2.    Public Policy Considerations

"A finding that the doctrine of primary assumption of risk applies in any given factual context is, in essence, a determination, reached as a matter of law, that the defendant should be excused from the usual duty of care based on some clear, overriding statutory or public policy."  Priebe, 140 P.3d at 853 (citing Neighbarger v. Irwin Indus., Inc., 882 P.2d 347 (Cal. 1994)).

In Priebe, the California Supreme Court articulated three public policy reasons in support of the Veterinarian's Rule.  First, "veterinarians, their trained assistants, and those in similarly situated professions (*e.g.*, dog groomers, kennel technicians) are in the best position, and usually the only position, to take the necessary safety precautions and protective measures to avoid being bitten or otherwise injured by a dog left in their care and control."  Id. at 860.

Second, "veterinarians, their trained assistants, and those in similarly situated professions (*e.g.*, dog groomers, kennel technicians) enter into contractual relationships with dog

17

owners and receive compensation for the services they provide, which services, by their very nature and design, include the safe care and handling of dogs left in their charge." Id. (emphasis omitted).

Finally, the Priebe court cited a Louisiana case which applied the "risk-utility balancing test" and concluded that "the utility of boarding services provided by a veterinarian to care for animals while the owner is away outweighs the risk and gravity of harm threatened by the dog[.]" Id. (citing Dubois v. Economy Fire & Cas. Co., 715 So.2d 131, 134 (La. Ct. App. 1998).

> Extending the veterinarian's rule as a bar to personal injury actions by kennel workers who are bitten or injured by a dog while on the job will therefore further serve the policy of encouraging dog owners to avail themselves of the services of licensed commercial dog kennels, without the threat of liability and lawsuits for injuries caused by their dogs' conduct hanging over their heads, conduct they are in no position to guard against or control once the dog is surrendered to the kennel for boarding.

Id. at 860-61.

With these policy considerations in mind, the Priebe court held that the Veterinarian's Rule applies "where the dog owner has completely relinquished the care, custody, and control of his or her dog to a . . . professional trained to care for and safely handle dogs, and the dog owner is therefore not in a position to supervise or prevent any conduct on the part of the dog." Id. at 859.

We conclude that these sound policy considerations are consistent with Hawaii's primary assumption of risk doctrine and are applicable here.

        3.   Care, Custody, and Control

        The Franks argue that HRS § 663-9 does not allow the

owner of a dog to transfer liability to a temporary custodian and

that legislative action is necessary to allow a dog owner to

transfer liability to a veterinarian or someone else who assumes

the care, custody, and control of a dog.  The Franks do dispute

that care, custody, and control of Primo had been transferred to

Dr. Holloway and the VCA staff when Shelby was injured.

        Although there is no definition of "owner" or

"harborer" in the statute, the purpose of HRS § 663-9 is as

follows:

> The legislature finds that recent court decisions allow a
> dog his "first bite" before an owner can be held liable for
> injuries caused by the dog, while at the same time holding
> an owner liable for injuries caused to a trespasser attacked
> by a dog, even if such injuries occur on the private
> property of the dog owner.  The legislature finds both
> holdings unacceptable.  In the first case, innocent public
> utility employees, visitors, and others legally on a
> property often go without a remedy.  In the second case,
> numerous state residents who keep dogs or other animals for
> protection against the rising crime rate (which the
> legislature herein specifically finds to exist) are hampered
> in using an effective means of crime prevention.

Act 218, 1980 Haw. Sess. Laws 367 § 1 at 366.

        The court decisions referred to by the legislature were

two premises liability cases, Pickard v. City and Cnty., 51 Haw.

134, 452 P.2d 445 (1969), and Farrior v. Payton, 57 Haw. 620, 562

P.2d 779 (1977).  In Pickard, the supreme court held that an

occupier of land has a duty to use reasonable care for all

persons reasonably anticipated to be on the premises.  51 Haw. at

135, 452 P.2d at 446.  Following this rule, in Farrior, the

supreme court held that dog owners may be found liable for

injuries sustained by trespassers when they fell off a rock wall

to avoid what they feared was an imminent attack by the dog.  57 Haw. at 629-33, 562 P.2d at 785-87.[6]

Under HRS § 663-9, liability does not just attach to those who own the animal but also applies to a harborer, someone who cares for the animal.  The legislature did not intend for the statute to hold owners of an animal exclusively liable for injuries.  As discussed above, nor did the legislature intend for the statute to negate common law defenses, such as the defense of primary assumption of risk.

4.    Application of the Veterinarian's Rule

The Franks assert that there are genuine issues of material fact regarding whether Spaulding was negligent in cropping Primo's ears, using the generic muzzle provided to him by VCA, or by improperly securing the muzzle.  The Franks contend that Primo's cropped ears altered the shape of his head, and made it easier for the muzzle to slip off.  Finally, the Franks argue that Spaulding knew or should have known of Primo's dangerous or vicious propensities based on Spaulding's request for a muzzle and Primo's barking and growling while in the examination room.

It is undisputed that Spaulding relinquished the care, custody, and control of Primo to Dr. Holloway and VCA staff at Dr. Holloway's direction.  The Franks offered no evidence that Spaulding withheld information from VCA staff or misled VCA staff in any way.  The Franks do not argue that Dr. Holloway or VCA

---

[6]    For the first time on appeal, the Franks argue that common law strict liability should be applied in this case because Spaulding knew Primo exhibited dangerous propensities and required a muzzle to prevent injury. This argument is waived.

were unaware that Primo's ears were cropped when they took control of him. It is undisputed that the muzzle was provided by VCA, and the muzzle provided by VCA had been checked for snug fit by either Dr. Holloway or Singson.

A muzzle is one way in which those handling dogs guard against a dog bite. It is sound public policy to encourage dog owners to provide or request muzzles precisely because animals could be unpredictable and act differently once out of the owner's control in the context of veterinary treatment. Once Primo was taken into the care, custody, and control of Dr. Holloway, Dr. Holloway, as the licensed veterinarian, and the technicians, and veterinary assistants at VCA were in the best position to take necessary precautions and protective measures.

We hold that Hawaii's primary assumption of risk doctrine bars a veterinarian and/or veterinary staff from recovering damages from a dog owner for a dog bite sustained on the job when the dog was in the care, custody, and control of a veterinarian and/or veterinary staff, and not the dog's owner. The inquiry is a legal one, not a factual one, based on the objective risk of handling dogs in a medical setting. Here, the Veterinarian's Rule barred Spaulding's normal duty of care, and thus the Franks cannot support a claim of negligence. Therefore, the Circuit Court did not err in concluding that the Veterinarian's Rule applied and that the Franks's claims against Spaulding were barred.

V.    CONCLUSION

For the reasons set forth above, the Circuit Court's March 4, 2019 Amended Final Judgment is affirmed.

On the briefs:

Roy K.S. Chang,
Harvey M. Demetrakopoulos,
(Shim & Chang),
for Plaintiffs-Appellants.

Richard B. Miller,
Patricia Kehau Wall,
(Tom Petrus & Miller, LLLC),
Defendant/Cross-Claim Defendant/
 Cross-Claim Plaintiff/Cross-Claim
 Plaintiff-Appellee.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge